# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | | |
|---|---|---|
| **MOSES M. HINKLE,** | ) | |
|    Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:09cv00063 |
| | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **MICHAEL J. ASTRUE,** | ) | |
|  Commissioner of Social Security, | ) | By:   P<small>AMELA</small> M<small>EADE</small> S<small>ARGENT</small> |
|    Defendant. | ) | U<small>NITED</small> S<small>TATES</small> M<small>AGISTRATE</small> J<small>UDGE</small> |

*I. Background and Standard of Review*

The plaintiff, Moses M. Hinkle, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2003 & Supp. 2009). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."

*Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Hinkle protectively filed his application for DIB on April 22, 2006, alleging disability as of April 1, 2006, based on neck, back and knee pain, fibromyalgia, sleep apnea, residuals of a mini stroke and hemorrhoids. (Record, ("R."), at 75-76, 93, 97, 119.) The claim was denied initially and upon reconsideration. (R. at 42-44, 48, 49-51.) Hinkle then requested a hearing before an administrative law judge, ("ALJ"). (R. at 54.) The ALJ held a hearing on December 12, 2007, at which Hinkle was represented by counsel. (R. at 21-39.)

By decision dated January 3, 2008, the ALJ denied Hinkle's claim. (R. at 11-20.) The ALJ found that Hinkle met the nondisability insured status requirements of the Act for DIB purposes through September 30, 2011. (R. at 13.) The ALJ also found that Hinkle had not engaged in substantial gainful activity since April 1, 2006. (R. at 13.) The ALJ found that the medical evidence established that Hinkle suffered from severe impairments, namely degenerative disc disease, degenerative changes of the left knee, fibromyalgia, sleep apnea, gout and carpal tunnel syndrome in the right wrist, but she found that Hinkle did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 13-14.) The ALJ also found that Hinkle had the residual

functional capacity to perform a limited range of light work.[1] (R. at 17.) The ALJ found that Hinkle could occasionally climb, balance, kneel, crawl, stoop and crouch and handle with the right nondominant hand. (R. at 17.) The ALJ also found that Hinkle should avoid hazardous machinery and vibrating surfaces. (R. at 17.) The ALJ found that Hinkle was unable to perform his past relevant work. (R. at 19.) Based on Hinkle's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that Hinkle could perform, including jobs as a production worker, a stock clerk, an inspector and a tester. (R. at 19-20.) Thus, the ALJ found that Hinkle was not under a disability as defined under the Act and was not eligible for benefits. (R. at 20.) *See* 20 C.F.R. § 404.1520(g) (2009).

After the ALJ issued her decision, Hinkle pursued his administrative appeals, (R. at 7), but the Appeals Council denied his request for review. (R. at 1-6.) Hinkle then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2009). This case is before the court on Hinkle's motion for summary judgment filed March 10, 2010, and on the Commissioner's motion for summary judgment filed April 12, 2010.

## II. Facts

Hinkle was born in 1955, (R. at 24, 75), which, at the time of the ALJ's

---

[1] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can do light work, he also can do sedentary work. *See* 20 C.F.R. § 404.1567(b) (2009).

decision, classified him as a "person closely approaching advanced age" under 20 C.F.R. § 404.1563(d). He has a high school education and past relevant work experience as a coal miner. (R. at 25, 98, 102, 125.)

Ann Marie Cash, a vocational expert, also was present and testified at Hinkle's hearing. (R. at 32-38.) She classified Hinkle's past work as a coal miner as heavy[2] and semiskilled. (R. at 33.) Cash was asked to assume a hypothetical individual of Hinkle's age, education and work history who could perform light work that required no more than occasional climbing, balancing, kneeling, crawling, stooping and crouching and occasional handling with the right nondominant hand. (R. at 33.) The individual also should avoid working around hazardous machinery, at unprotected heights, climbing ladders, ropes and scaffolds and working on vibrating surfaces. (R. at 33.) In addition, the individual should be allowed to alternate between sitting and standing, which could be accomplished during normal breaks. (R. at 33.) Cash stated that a significant number of jobs existed that such an individual could perform, including jobs as a production worker, a stock clerk, an inspector and a tester. (R. at 34.)

Cash was then asked to consider the same individual who would be limited as indicated by Dr. Clinton H. Sutherland, M.D. (R. at 34-35, 199-201.) She stated that there would be no jobs available that such an individual could perform. (R. at 35.) She was asked to consider the same individual, but who had a greater than moderate difficulty in his ability to maintain attention and concentration and to handle stress.

---

[2]Heavy work involves lifting objects weighing up to 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, he also can do medium, light and sedentary work. *See* 20 C.F.R. § 404.1567(d) (2009).

(R. at 35.) She stated that there would be no jobs available that such an individual could perform. (R. at 35-36.) Cash was asked to consider the same individual, but who had to avoid moderate exposure to noise. (R. at 37.) Cash stated that the above mentioned jobs would be reduced to one-third. (R. at 37-38.)

In rendering his decision, the ALJ reviewed records from Dr. Clinton H. Sutherland, M.D.; Buchanan General Hospital; Dr. Lawrence Wallace, M.D.; Dr. Ravi K. Titha, M.D.; Dr. Richard Surrusco, M.D., a state agency physician; and Dr. Donald Williams, M.D., a state agency physician. Hinkle's attorney also submitted records from Dr. Nasreen R. Dar, M.D., a psychiatrist, and Robert C. Miller, Ed.D., a licensed clinical psychologist, to the Appeals Council.[3]

The record shows that Dr. Clinton H. Sutherland, M.D., treated Hinkle for various complaints such as lumbar degenerative disc disease, cervical degenerative disc disease, internal derangement of the left knee, irritable bowel syndrome, carpal tunnel syndrome, hearing loss, hypogonadism,[4] chronic vertigo and sleep apnea. (R. at 148-65, 171-73, 202-10, 218.) Dr. Sutherland opined that Hinkle's conditions would last more than 12 months and that these conditions were confirmed through clinical and physical examinations, medical history and radiological studies. (R. at 218.) Dr. Sutherland opined that Hinkle was unable to perform any type of gainful

---

[3]Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 1-6), this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

[4]Hypogonadism is defined as inadequate functioning of the testes or ovaries as manifested by deficiencies in gametogenesis or the secretion of gonadal hormones. *See* STEDMAN'S MEDICAL DICTIONARY, ("Stedman's"), 395 (1995.)

employment. (R. at 218.) On November 19, 2007, Dr. Sutherland completed a medical assessment, indicating that Hinkle could occasionally lift and carry items weighing up to 15 pounds and frequently lift and carry items weighing up to 10 pounds. (R. at 199-201.) He indicated that Hinkle could stand and/or walk a total of three hours in an eight-hour workday and that he could do so for up to 30 minutes without interruption. (R. at 199.) Dr. Sutherland reported that Hinkle could sit a total of three hours in an eight-hour workday and that he could do so for up to one hour without interruption. (R. at 200.) He indicated that Hinkle could occasionally climb stairs, stoop, balance and crouch and never kneel or crawl. (R. at 200.) Dr. Sutherland indicated that Hinkle's abilities to reach, to handle and to hear were limited. (R. at 200.) Dr. Sutherland reported that Hinkle was restricted from working around heights and temperature extremes. (R. at 201.) He also indicated that Hinkle would be absent from work more than two days a month due to his impairments. (R. at 201.)

On October 11, 2006, Dr. Lawrence Wallace, M.D., saw Hinkle for complaints of chronic left knee pain, chronic back pain and cervical spine pain. (R. at 168-69.) An MRI of Hinkle's left knee showed a medial meniscus tear and a sprain of the anterior cruciate ligament. (R. at 160-61, 168.) An MRI of Hinkle's cervical and lumbar spine showed degenerative disc disease at the C5-C6 disc space and disc desiccation with mild bulging annulus at the L4-L5 level. (R. at 149-50, 168.) Dr. Wallace diagnosed a left knee medial meniscal tear. (R. at 169.) On November 10, 2006, and December 20, 2006, Dr. Wallace reported that Hinkle had pain with full extension of his knee. (R. at 166-67.) Hinkle had no knee ligamentous instability. (R. at 166-67.) Dr. Wallace diagnosed left knee pain and prescribed conservative treatment. (R. at 166-67.)

On January 25, 2007, Dr. Ravi K. Titha, M.D., examined Hinkle at the request of Disability Determination Services. (R. at 174-80.) Dr. Titha reported that Hinkle was in no acute distress and that he had normal gait and station. (R. at 176.) Hinkle's gross and fine manipulation were normal. (R. at 176.) Dr. Titha reported that Hinkle had no significant limitation in flexion or extension of the lumbar spine. (R. at 177.) Straight leg raising was negative to 90 degrees sitting and lying down bilaterally. (R. at 177.) Sensory examination was normal. (R. at 177.) Hinkle had difficulty in complete flexion of the left hand fifth finger. (R. at 177.) Hinkle's mood and affect were normal. (R. at 177.) He had normal concentration, attention and judgment. (R. at 177.) Dr. Titha diagnosed low back pain resulting from degenerative spinal disease, left knee joint pain resulting from degenerative arthritis, sensory hearing loss, gout, peptic ulcer disease, fibromyalgia and obstructive sleep apnea.[5] (R. at 177.) Dr. Titha reported that Hinkle would have some limitations in his physical activities and activities of daily living due to degenerative arthritis, but in his lumbosacral spine, the extent of disease was not severe enough to limit his activities as Hinkle claimed. (R. at 178.) Dr. Titha reported that Hinkle could sit, stand and walk five to six hours in an eight-hour workday. (R. at 178.) Dr. Titha found that Hinkle could frequently lift and carry items weighing up to 15 pounds. (R. at 178.) Dr. Titha reported that Hinkle could frequently bend, stoop, crouch and crawl, and Hinkle had no limitations in his ability to reach, to handle, to feel or to grasp. (R. at 178.) No visual, communicative or environmental limitations were noted. (R. at 178.)

On February 7, 2007, Dr. Richard Surrusco, M.D., a state agency physician, indicated that Hinkle had the residual functional capacity to perform light work. (R.

---

[5]The record does not contain documentation of sleep studies.

at 181-87.) Dr. Surrusco indicated that Hinkle could occasionally climb, balance, stoop, kneel, crouch and crawl. (R. at 183.) No manipulative, visual, communicative or environmental limitations were noted. (R. at 183-84.)

On May 22, 2007, Dr. Donald Williams, M.D., a state agency physician, indicated that Hinkle had the residual functional capacity to perform light work. (R. at 192-98.) Dr. Williams indicated that Hinkle could occasionally climb, balance, stoop, kneel, crouch and crawl. (R. at 194.) No manipulative, visual, communicative or environmental limitations were noted. (R. at 194-95.)

On October 25, 2007, Dr. Nasreen R. Dar, M.D., a psychiatrist, diagnosed Hinkle with dysthymic disorder, and she prescribed Cymbalta. (R. at 223.) On November 29, 2007, Dr. Dar evaluated Hinkle. (R. at 212-14.) Dr. Dar reported that Hinkle's affect and mood were depressed. (R. at 213.) Hinkle's concentration was impaired. (R. at 213.) His recent and remote memory was intact. (R. at 213.) Dr. Dar diagnosed major depressive disorder and back pain. (R. at 213.) Dr. Dar reported that Hinkle did not "appear able to tolerate much stress or handle any gainful employment." (R. at 214.) Dr. Dar saw Hinkle on December 20, 2007, and Hinkle complained of being nervous. (R. at 223.) On January 31, 2008, Hinkle reported that he was doing "fair" emotionally. (R. at 225.) He reported that he was eating and sleeping "fair." (R. at 225.) On March 4, 2008, Hinkle reported doing "fair" and stated that he had no complaints. (R. at 225.)

On January 23, 2008, Robert C. Miller, Ed.D., a licensed clinical psychologist, evaluated Hinkle at the request of Hinkle's attorney. (R. at 219-22, 226.) The

Minnesota Multiphasic Personality Inventory-2, ("MMPI-2"), was administered and found to be valid, indicating the presence of severe symptoms. (R. at 221.) Hinkle reported that he was struck on the head by rocks while working in the coal mines. (R. at 221.) He stated that he had nightmares of rock falls. (R. at 221.) Miller diagnosed moderate to severe major depressive disorder, panic disorder without agoraphobia and chronic post-traumatic stress disorder. (R. at 222.) Miller reported that Hinkle had a then-current Global Assessment of Functioning score, ("GAF"),[6] of 45.[7] (R. at 222.)

Miller completed a mental assessment, indicating that Hinkle had a limited, but satisfactory, ability to maintain personal appearance. (R. at 228-32.) He indicated that Hinkle had a seriously limited ability to use judgment, to function independently and to understand, remember and carry out simple job instructions. (R. at 228-30.) He also indicated that Hinkle had no useful ability to follow work rules, to relate to co-workers, to deal with the public, to interact with supervisors, to deal with work stresses, to maintain attention and concentration, to understand, remember and carry out complex and detailed instructions, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. (R. at 228-30.) Miller reported that Hinkle was not capable of managing his own benefits. (R. at 232.) Miller also reported that Hinkle would be absent from work more than two days a month as a result of his impairments. (R. at 232.)

---

[6] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[7] A GAF score of 41-50 indicates that the individual has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning ...." DSM-IV at 32.

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2009); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2009).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2)(A) (West 2003 & Supp. 2009); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in the case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its

judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

By decision dated January 3, 2008, the ALJ denied Hinkle's claim. (R. at 11-20.) The ALJ found that the medical evidence established that Hinkle suffered from severe impairments, namely degenerative disc disease, degenerative changes of the left knee, fibromyalgia, sleep apnea, gout and carpal tunnel syndrome in the right wrist, but she found that Hinkle did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 13-14.) The ALJ also found that Hinkle had the residual functional capacity to perform a limited range of light work. (R. at 17.) The ALJ found that Hinkle was unable to perform his past relevant work. (R. at 19.) Based on Hinkle's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that Hinkle could perform, including jobs as a production worker, a stock clerk, an inspector and a tester. (R. at 19-20.) Thus, the ALJ found that Hinkle was not under a disability as defined under the Act and was not eligible for benefits. (R. at 20.) *See* 20 C.F.R. § 404.1520(g).

In his brief, Hinkle argues that the ALJ erred by failing to find that he suffered from a severe mental impairment. (Brief In Support Of Plaintiff's Motion For

Summary Judgment, ("Plaintiff's Brief"), at 6-8.) Hinkle also argues that the ALJ erred by failing to give appropriate weight to his treating physician, Dr. Sutherland. (Plaintiff's Brief at 6, 8-10.) Based on my review of the evidence, I agree that the ALJ erred by failing to consider whether Hinkle suffered from a major depressive disorder and what, if any, effect this had on his work-related abilities.

Dr. Dar first saw Hinkle in October 2007 and diagnosed him with a dysthymic disorder. (R. at 223.) In November 2007, Dr. Dar diagnosed Hinkle with major depressive disorder and reported that he could not tolerate stress or handle any gainful employment. (R. at 213.) The ALJ noted that she considered Dr. Dar's opinions and rejected them because the record did not contain evidence supporting a mental impairment. (R. at 16.) In January 2008, Miller diagnosed Hinkle with moderate to severe major depressive disorder, panic disorder without agoraphobia and chronic post-traumatic stress disorder. (R. at 222.) Miller indicated that Hinkle had a number of limitations on his work-related abilities. (R. at 228-30.) The ALJ did not have Miller's report before her before rendering her decision. Miller's report was provided to the Appeals Council on Hinkle's request for review of the ALJ's decision denying benefits. The Appeals Council noted that Miller's report post-dated the ALJ's decision and that it was not consistent with the objective medical evidence of record. (R. at 2.) I note that the ALJ's decision is dated January 3, 2008, and Miller saw Hinkle on January 23, 2008, just 20 days after the ALJ's decision. The Appeals Council noted that Miller's assessment was inconsistent with the objective medical evidence and that Miller failed to cite medical evidence to support his assessment. (R. at 2.) The evidence of record does not support this finding. As noted above, Dr. Dar also diagnosed Hinkle with major depressive disorder and indicated that he could not

tolerate stress and that his concentration was impaired. (R. at 213.) Miller diagnosed major depressive disorder and placed a number of limitations on Hinkle's work-related abilities. (R. at 222, 228-32.) Miller administered a number of tests and found them all to be valid. (R. at 219-22.) Thus, the only expert psychological or psychiatric opinions of record agrees that Hinkle suffers from a mental impairment that affects his work-related abilities.

The Social Security regulations define a "nonsevere" impairment as an impairment or combination of impairments that does not significantly limit a claimant's ability to do basic work activities. *See* 20 C.F.R. § 404.1521(a) (2009). In the context of a mental impairment, basic work activities include understanding, carrying out and remembering simple job instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations and dealing with changes in a routing work setting. *See* 20 C.F.R. § 404.1521(b) (2009). The Fourth Circuit held in *Evans v. Heckler*, that "'"[a]n impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience."'" 734 F.2d 1012, 1014 (4th Cir. 1984) (quoting *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)) (citations omitted). Based on the above, I do not find that substantial evidence exists to support the ALJ's finding that Hinkle did not suffer from a severe mental impairment.

Hinkle also argues that the ALJ erred by failing to give appropriate weight to his treating physician, Dr. Sutherland. (Plaintiff's Brief at 6, 8-10.) The ALJ noted that she was rejecting Dr. Sutherland's opinion because it was not supported by progress notes or objective findings. (R. at 16.) The ALJ also noted that Hinkle received only

conservative treatment for his complaints of back and knee pain and that he had not been referred for pain management. (R. at 19.) Dr. Sutherland's notes document normal physical examination findings and no specific musculoskeletal abnormalities. (R. at 171, 202-06.) His treatment notes fail to suggest that Hinkle had significant functional limitations. (R. at 148-50, 171-73, 202-10.) Diagnostic studies of Hinkle's lumbar spine showed only spurring and mild degenerative disc disease. (R. at 159.) A cervical spine MRI showed degenerative disc disease at the C5-6 disc space with mild protrusion, but no resulting spinal or foraminal stenosis. (R. at 149.) A lumbar spine MRI revealed disc desiccation with mild bulging annulus at the L4-L5 level, but no significant spinal or foraminal stenosis. (R. at 150.) While these diagnostic studies support the ALJ's conclusion that Hinkle had severe impairments that limited him to a range of light work, they do not support Dr. Sutherland's extreme opinion of disability.

Dr. Titha reported that Hinkle had a normal gait and station, could dress and undress without difficulty and had no difficulty performing fine and gross manipulations. (R. at 176-77.) Hinkle had full motor strength in his arms and legs, intact sensation, negative straight leg raising tests and slightly diminished range of motion in his dorsolumbar spine, but normal range of motion in all other areas. (R. at 177-79.) Dr. Titha reported that Hinkle's limitations in his physical activities and activities of daily living were not as extreme as he claimed. (R. at 178.) Dr. Titha found that Hinkle retained the ability to frequently lift items weighing up to 15 pounds. (R. at 178.) Dr. Titha's assessment is supported by the state agency physicians' assessments, who found that Hinkle could perform light work. (R. at 181-87, 192-98.) Based on this, I find that the ALJ properly weighed the medical evidence.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence does not exist to support the ALJ's finding that Hinkle did not suffer from a severe mental impairment;

2. Substantial evidence exists to support the ALJ's finding with regard to Hinkle's physical residual functional capacity; and

3. Substantial evidence does not exist to support the ALJ's finding that Hinkle was not disabled under the Act.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Hinkle's and the Commissioner's motions for summary judgment, vacate the final decision of the Commissioner denying benefits and remand Hinkle's claim to the Commissioner for further consideration with regard to Hinkle's mental impairments and their effect on his work-related abilities.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2009):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Chief United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED: June 3, 2010.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE